Filed 12/30/14  In re Jonathan H. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re JONATHAN H., <br><br> a Person Coming Under the Juvenile Court Law. | B252182 <br> (Los Angeles County <br>  Super. Ct. No. DK00326) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JUDITH H., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Robert S. Draper, Judge.  Affirmed.

Jesse F. Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and John C. Savittieri, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

Judith H. (Mother), appeals from a dependency court order asserting jurisdiction over her son, Jonathan H., based on the sexual abuse of four of her nieces by her husband, Juan H., who is Jonathan's father (Father).[1]  Finding that substantial evidence supports the exercise of dependency jurisdiction under Welfare and Institutions Code section 300, subdivision (d), we affirm.[2]

# FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother married in 1991 and have three children together, Bernice (born in 1990), Michelle (born in 1995), and Jonathan (born in 2009).  Mother also has a son, Diego (born in 1989), from a previous relationship.

*2011 DCFS Referral*

In October 2011, the Department of Children and Family Services (DCFS) received a referral indicating that Michelle might be in danger of being sexually molested by Father.  An adult family member had disclosed that Father molested her when she was a child.  Michelle denied to DCFS ever being sexually molested herself and denied being aware that Father had molested any of her relatives.  Jonathan, who was two years old at the time, appeared to be healthy, happy, and bonded to his parents.  Adult siblings Diego and Bernice denied any abuse by Father.  DCFS concluded the allegations were unfounded and closed the referral.

---

[1]  Father is not a party to this appeal.

[2]  All further statutory references are to the Welfare and Institutions Code.

*SCAR Report*

A subsequent DCFS referral by another of Father's alleged molestation victims led to an investigation and Suspected Child Abuse Report ("SCAR") dated August 1, 2013, by Deputy J. Allen from the Los Angeles County Sheriff's Department. Deputy Allen contacted Michelle, who stated that everything in her household was very good and she had no problems with Father. She denied that Father was ever sexually abusive or inappropriate. She appeared to be in good spirits and displayed no signs of emotional trauma. Deputy Allen also contacted Jonathan, but was unable to have a conversation with him due to his young age. However, Jonathan appeared to be happy and displayed no signs of physical or emotional trauma. Mother stated that she was aware that her sister's daughter, Stephanie, had accused Father of sexually abusing her, but she had never seen or heard of any inappropriate behavior by Father towards either Michelle or Jonathan. Father denied that he had ever acted inappropriately towards any child.

Deputy Allen interviewed sisters Stephanie and A., who were Mother's nieces. Stephanie stated that approximately 11 years earlier, when she was in the first or second grade, she would often stay overnight at Mother and Father's house. One of those nights, she woke to find Father touching her chest and her vagina over her clothes. When Father finished, he told her not to say anything because if she did, bad things would happen. On approximately six other occasions when she stayed overnight and Mother left in the early morning to go to work, Father woke her up from her sleep, removed her clothes, and licked her body, including her chest and vagina. On the last and final time she spent the night there, she woke up to get a glass of water. Father approached her and got her the water. Then he picked her up, took her to his room, laid her on his bed, and locked the door. Stephanie got up and tried to open the door but was too disoriented and weak to do so. She believes she blacked out, and when she woke up her clothes were off, and

3

she was being bent over, lying face down on the bed, with Father behind her pushing himself against her. Stephanie does not know if Father penetrated her vagina. She went back to her cousin's room and went back to sleep. She did not tell anyone about the incident because she feared something bad would happen. She stated that Father had also sexually abused her sister, A., and that she believed he may have abused two of her cousins, Rosa and Karolina.

A. told Deputy Allen that approximately 12 years earlier, Father sexually abused her on approximately five occasions when she spent the night at his home. On these occasions she woke up to find Father touching her vagina inside her underwear. She does not remember if he penetrated her vagina. The last time that he touched her vaginal area, she remembers finding a sticky substance there after he was finished.

*Section 300 Petition and Detention Report*

Based on the SCAR report, DCFS filed a petition pursuant to section 300, alleging jurisdiction under subdivisions (b) and (d), with respect to Jonathan and his sister Michelle, who was 17 years old at the time.[3] As the basis for jurisdiction under both subdivisions (b) and (d), the petition alleged that in 2001 and 2002, Father sexually abused the children's cousins, Stephanie and A., and Mother knew of the abuse and failed to protect the children. Both children were detained from Father, and he was ordered to reside in a separate residence, with DCFS given discretion to allow Father to reside in the home. Father was granted unmonitored visits in a public setting.

The detention report included the substance of DCFS interviews with Mother, Father, and Michelle. Mother stated that she was aware of the allegations

[3] Michelle was later dismissed from the petition when she turned 18.

4

made in the past, and that the accusers were lying. Father denied the accusations as well. Michelle recalled that similar allegations had been made several years earlier, but she denied any abuse by Father and denied any knowledge of Father abusing anyone else. The DCFS caseworker was unable to interview Jonathan because he was asleep and his parents were not able to wake him sufficiently. However, he appeared well-cared for and healthy.

*August 27, 2013 Supplemental Police Report*

Detective Alfonso Lopez, of the Special Victims Bureau of the Los Angeles County Sheriff's Department, conducted a further investigation and provided a report dated August 27, 2013.

Detective Lopez first interviewed Stephanie, who was then a senior in high school. She stated that when she in the first grade, about six years old, Father, whom she called "Uncle Juan," touched her on approximately six nights when she spent the night there. The first time, when she was sleeping in the living room with the other children, she awoke to find Uncle Juan touching her breasts. He pulled her shirt off and fondled her. He also touched her vagina. Throughout that summer, every time she and her family spent the night, Uncle Juan would touch and fondle her. On at least one occasion she remembers Father licked her vagina and inserted his finger inside her. She was very frightened and did not know what to do.

One night, when she got up to get a drink of water, Father approached her in the kitchen, picked her up, and took her to his bedroom. She could not recall every detail because she was very sleepy and in and out of sleep when the assault took place. She remembered that he put her on the bed, pulled her pants and underwear down, pulled his own pants down, and thrust his hips into her from behind. When asked if she meant he was having sex with her, she said she could not say for sure.

5

Detective Lopez also interviewed A., who told him that when she was 12 years old Father molested her on a number of occasions when her family spent the night at Father's home after a family party or barbecue. She would go to sleep with the other children on the floor in her cousin Michelle's room, and would wake up to find Father lying next to her, fondling her vagina, under her underwear. Once she woke up, she would look at him and roll away and he would stop the assault. On the last incident, she awoke to find that Father had pulled her shorts and underwear to the side and had his face between her crotch. When he saw she had awakened, Father got up and left the room. The abuse stopped because they stopped going over to Father's house. A. stated that two years earlier, she told Mother at a family meeting what Father had done to her and her sister. Mother acted as though she did not believe it.

Detective Lopez also interviewed two more of Jonathan's cousins, Karolina and Rosa, the daughters of Mother's brother. Karolina stated that in 2006, when she was in fifth grade and around 10 years old, she was at a barbeque at Father's house. All the children decided to walk to the store to buy some candy, but Father stopped her before she could catch up with the other children. He picked her up and placed her on his lap and tried to kiss her on the mouth, but she pulled away from him. He then pulled her underwear aside under her skirt and touched her vagina and her buttocks before she pulled away from him and got off his lap. He told her not to tell anyone because they would not believe her. She ran into the kitchen and told Mother that she did not like the way Father was playing with her. Mother just told her to stay away from him. Karolina stated this was the only incident because she told her own mother what had happened and they never went to Father's house again.

Karolina also stated that on a previous overnight visit, when she and the other children were sleeping on the floor in Michelle's bedroom, she saw Father

6

pick up her sister Rosa, who was asleep. Karolina asked him where he was taking Rosa and he replied that it was too crowded in the bedroom. Karolina did not see what happened once he took Rosa out of the bedroom.

Detective Lopez interviewed Rosa as well. She stated that when she was approximately five years old, she was spending the night at Father's house after a family birthday party. She went to sleep on a couch in Michelle's bedroom, but she was awakened to find her pajama pants and underwear had been pulled down and Father was touching her on her butt. She tried to pull them up but Father pulled them down again. The next day, when Father supposedly was trying to teach her how to ride a bike, he touched her vaginal area over her clothes.

Karolina and Rosa's mother, Margarita, confirmed that her children told her that Father had touched them. She did not call the police because she is undocumented.

Based on the investigation by the Los Angeles County Sheriff's Department, Father was arrested and jailed.

*September 2013 DCFS Interviews*

In an interview with a DCFS caseworker, Michelle stated that she never suspected any abuse of her cousins, A. and Stephanie, and that they never acted strange or different around Father. She noted that they stopped coming to visit approximately two years earlier. Michelle stated that A. and her baby came to live with her family when Michelle was 13 or 14 years old. Michelle did not remember how long A. resided with her family. Michelle remembered that her cousins Karolina and Rosa also used to visit their home, but she did not remember additional details because they had not visited for a long time.

Mother acknowledged that there had been an investigation two years earlier regarding A.'s allegations. Mother stated that her daughter Michelle had been

7

interviewed at school, and that when Mother arrived at home later that day, Michelle and Bernice were crying and told her what the investigating caseworker had told Michelle about the allegations. Mother stated that she asked Michelle and Bernice whether they had seen or heard anything and that they denied it. Mother stated, "[Father] only told me that he never did anything. I didn't want to know anything. I didn't ask what he thought about why they had accused him." Mother did not speak with Stephanie or A. about their accusations, stating, "I didn't have the courage to ask them. I feared to ask."

Mother stated that Stephanie and A. used to spend the night and sleep in the bedroom with Michelle and Bernice. She stated that she had doubts about whether Father had really abused them. She and A. were together often because they worked together, and A. had come to live in her house for a time, but A. had never brought the subject up with her. She acknowledged that two years earlier, A. and her mother had talked to her about the abuse, but A. was laughing. After the conversation Mother stopped talking to her sister, A.'s mother, because she "needed space." Mother also denied any knowledge of sexual abuse of Karolina and Rosa, although she acknowledged that they sometimes spent the night in earlier years.

Mother further stated, "Nothing happened in this home. I want my husband back home. I want my family back together. I feel confused. I don't know what to do about something he did over 10 years ago. I could have done something back then if I knew, but what am I supposed to do about it now? I am on the fence on whether he did this or not."

Father denied abusing Stephanie and A., and stated that A. would not have come to live with them if he had done those things to her. He explained that A. came to live with them with her baby when her mother kicked her out. He told the DCFS caseworker that he had suspected that both Stephanie and A. were victims

8

of sexual abuse because he "saw the girls sit on their dad's lap and they would maneuver on his lap. . . . [He got] close to them to find out if they were being abused." He said he put his hand on A.'s lower back while she was sleeping in the bedroom with his daughter, Bernice, and two other children. He stated, "I can't explain my intention, but if I wanted to hurt them I would've hurt them." He also stated that he also once placed his hand on Stephanie's back, because he thought she was being abused. Father stated that when he told Mother "what [he] did to try to investigate if [Stephanie and A.] had been touched, [Mother] told [him that he] should have minded [his] own business or [he] should've talked to the girls' parents."

When asked about allegations that he also touched Karolina and Rosa, Father noted that Rosa had once accused him of taking her out of the bedroom, but he maintained that she had made up the allegation. He noted that Rosa was a very nervous child whom he suspected also was abused, because once he followed her and she told him not to follow her because others would see them.

*October 8, 2013 Amended Section 300 Petition*

Based on the new allegations of abuse against Karolina and Rosa, DCFS filed an amended section 300 petition under subdivisions (b) and (d), adding those allegations.

*Jurisdiction and Disposition Hearing*

On October 15, 2013, the juvenile court held a combined jurisdiction and disposition hearing. The court concluded there was ample evidence that Father sexually molested Jonathan's four young cousins. Although the evidence did not reveal any abuse since 2006, there was no showing that Father had undergone any kind of treatment or programs to address his conduct. Based on the seriousness of

the acts, the court concluded that Jonathan was at risk of sexual molestation. The court further found that Mother failed to protect Jonathan by remaining willfully blind to Father's sexual abuse of their nieces. Thus, the court sustained the amended section 300 petition as pled and declared Jonathan a dependent child. The court removed him from Father's custody and ordered a case plan of enhancement services and, upon Father's release from custody, monitored visitation.

Father timely appealed from the jurisdictional and disposition orders.

## DISCUSSION

Mother does not challenge the factual finding that Father sexually abused four female cousins of Jonathan, when the girls were between the ages of five and 14, from 2001 to 2006. Rather, she contends that evidence of such abuse is insufficient to find a substantial risk of harm to Jonathan. She asserts that Father has demonstrated no proclivity to abuse his own children, male or female. She relies on the fact that Michelle, now 18 years old, denies any sexual abuse or inappropriate conduct towards her by Father. She further notes that during an earlier DCFS investigation in 2011, Father's adult stepson Diego, and his own adult daughter Bernice, denied that Father sexually abused them. She contends that "[t]he absence of evidence that [Father] abused his own children before Jonathan is the linchpin in this case." We disagree.

In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings, we determine if substantial evidence, contradicted or uncontradicted, supports them, drawing all reasonable inferences from the evidence to support the findings and orders of the dependency court. We do not reweigh the evidence or exercise independent judgment, and review the whole record in the light most favorable to the judgment below to determine whether it

10

discloses substantial evidence such that a reasonable trier of fact could find that the order sustaining jurisdiction is appropriate. (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Precious D.* (2010) 189 Cal.App.4th 1251, 1258–1259.) "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J., supra,* 56 Cal.4th at p. 773.)

The purpose of section 300 "'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm.*' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J., supra*, 56 Cal.4th at p. 773.) We conclude that, even in the absence of evidence that Father has abused his own progeny, sufficient evidence supported the finding under section 300, subdivision (d) that "there is a substantial risk that [Jonathan] will be sexually abused, . . . by his or her parent or guardian . . . , or the parent or guardian has failed to adequately protect [Jonathan] from sexual abuse when the parent or guardian knew or reasonably should have known that [Jonathan] was in danger of sexual abuse." (§ 300, subd. (d).)

Our holding affirming the jurisdictional findings is supported by *In re I.J., supra*, 56 Cal.4th 776, in which the Supreme Court concluded the juvenile court properly assumed jurisdiction over a father's minor sons, ages eight and 12, pursuant to section 300, subdivisions (b), (d), and (j), where the father was found

11

to have severely sexually abused his 14-year-old daughter over a three-year period, including forcibly raping her. (*Id.* at pp. 770-771, 778.) The Supreme Court held that, in determining whether a child who may not yet have been sexually abused is at substantial risk of such abuse, dependency courts should consider "the circumstances surrounding, and the nature of," the sexual abuse in the record. (*Id.* at p. 778.) "[T]he more egregious the abuse, the more appropriate for the juvenile court to assume jurisdiction over the siblings. . . . '[I]n order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm . . . .' [Citation.] In other words, the more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse." (*Ibid.*)

Although there was no evidence that the father in *In re I.J., supra*, 56 Cal.4th 766, sexually abused his sons, and they were unaware of their sister's abuse, the Supreme Court found that jurisdiction over the boys was appropriate given that the father's sexual abuse of his daughter was "prolonged and egregious." (*Id.* at p. 770.) "Also relevant to the totality of the circumstances surrounding the sibling abuse is the violation of trust shown by sexually abusing one child while the other children were living in the same home and could easily have learned of or even interrupted the abuse. '[S]exual or other serious physical abuse of a child by an adult constitutes a fundamental betrayal of the appropriate relationship between the generations. . . . When a parent abuses his or her child, . . . the parent also abandons and contravenes the parental role. Such misparenting is among the specific compelling circumstances which may justify state intervention, including

an interruption of parental custody. (See § 300, subds. (d), (e), (j).)' [Citation.]" (*In re I.J., supra*, 56 Cal.4th at p. 778.) The court held as follows: "For present purposes, we may assume that father's other daughter is at greater risk of sexual abuse than are his sons. But this does not mean the risk to the sons is nonexistent or so insubstantial that the juvenile court may not take steps to protect the sons from that risk. 'Although the danger of sexual abuse of a female sibling in such a situation may be greater than the danger of sexual abuse of a male sibling, the danger of sexual abuse to the male sibling is nonetheless still substantial.' [Citation.]" (*Id.* at pp. 779-780.)

Father states that "it is not the crux of [his] argument that Jonathan is not at risk of sexual abuse because he is male and Jonathan's cousins are female." Rather, Father seeks to distinguish *In re I.J.* primarily on the ground that the girl whom the father had sexually abused was the *sibling* of the boys over whom dependency jurisdiction was challenged, whereas in this case Father molested Jonathan's cousins rather than his sibling. He contends that this fact, coupled with the lack of evidence of any sexual abuse since Jonathan was born, compels a finding that Jonathan is not at substantial risk of abuse.

Although Father is correct that *In re I.J.* concerned siblings, of whom one had been abused and the others were deemed to be at risk, we do not believe that the decision is wholly inapplicable here simply because Father previously abused nieces rather than his own children. Father and Mother had a close familial relationship with the nieces, evidenced by their nieces' repeated overnight visits and their reference to him as "Uncle Juan." Moreover, the central holding of *In re I.J.* is that even if there is a relatively low probability that a child will be sexually abused, based on the proclivities demonstrated by the abuser, a dependency court may still find the child at substantial risk if the abuse in the record was egregious.

In this case, the evidence demonstrates Father preyed on four different young nieces over at least a five-year period. He molested six-year-old Stephanie on approximately six occasions when she was sleeping in her cousin Michelle's room; the abuse included fondling her vagina, and on at least one occasion orally copulating her and digitally penetrating her vagina. On another occasion, Father removed her pants and underwear, bent her over and thrust himself against her from behind. Father also sexually abused 12-year-old A. on at least five occasions, including fondling her vagina inside her underwear, and on a final occasion orally copulating her and leaving a sticky substance on her vagina. Father also abused 10-year-old Karolina, fondling her vagina and buttocks under her underwear. Finally, Karolina's five-year-old sister Rosa also awoke in her cousin Michelle's bedroom to find Father touching her buttocks under her clothes, and the next day, while supposedly trying to help her learn to ride a bicycle, he touched her vaginal area over her clothes.

This serial abuse, which ended only when the girls stopped coming to visit in order to avoid Father, is easily characterized as prolonged and egregious. So long as Father continued to have access to each girl, his sexual assaults escalated in nature and severity, to include oral copulation, digital vaginal penetration, and (at a minimum) simulated vaginal intercourse. Although, as Father points out, all the abuse happened before Jonathan was born, the dependency court reasonably could have inferred that the abuse ended only because relatives no longer came to visit or spend the night. Much of the abuse that occurred between 2001 and 2006 took place in Michelle's bedroom, while she was sleeping in the same room, demonstrating that Father had no qualms about perpetrating the abuse with one of his own children in the room.

In affirming the jurisdictional order in this case, we find further support in *In re Ana C.* (2012) 204 Cal.App.4th 1317, and *In re Ricky T.* (2013) 214 Cal.App.4th

514 (*Ricky T.*). In *In re Ana C.*, the court exercised dependency jurisdiction over a father's young sons based on evidence that the father had sexually abused the mentally disabled 11-year-old daughter of his girlfriend. The evidence showed that on at least one occasion, the father orally copulated her and put his penis in the girl's crotch area while she was sleeping on the living room couch, where she generally slept with another young girl living in the home. (*In re Ana C., supra,* 204 Cal.App.4th at pp. 1320-1323.) The appellate court concluded that the father's sons were at substantial risk of abuse, given "[t]he nature and extent of the abuse, that it was perpetrated upon a particularly vulnerable child, [and] that the abuse was conducted in a place where it was observed by her younger sister and capable of being observed by other siblings." (*In re Ana C., supra,* 204 Cal.App.4th at p. 1332.) The court also relied on the fact that the live-in girlfriend, Ana's mother, had demonstrated a willingness to turn a blind eye to abuse by the father, as she had been told about the abuse and did not take any action to stop the father. (*Ibid.*)

Similarly, in *Ricky T.*, a grandfather appealed the jurisdictional orders made with respect to his three-year-old grandson, Ricky, who lived in the grandfather's home. The grandfather had been convicted of sexually abusing his two step-granddaughters, then ages 12 and nine years, by fondling their breasts and crotch areas. (*Ricky T., supra*, 214 Cal.App.4th at pp. 518-519.) The appellate court affirmed the dependency court's finding that Ricky was at risk of harm in his grandfather's care. In addition to finding reasonable the inference that Ricky was at risk of being exposed to the grandfather's sexual abuse of *other* children (*id.* at p. 523), the court determined that Ricky himself was at substantial risk of being sexually abused. Although the grandfather claimed to be attracted only to mature females, he began abusing one step-granddaughter when she was pre-pubescent. Further, Ricky was especially vulnerable because he was only three years old and was autistic, and because his mother did not believe the sexual abuse allegations

15

and had indicated that she intended to continue to give the grandfather access to the children in the home.[4] (*Ibid.*)

In *In re Ana C.* and *Ricky T.*, the appellate courts drew no distinction based on the fact that the minor girls who had been sexually abused were not actual siblings of the boys over whom dependency jurisdiction was sought. Rather, the courts focused on the nature of the abuse and the vulnerabilities of the child over whom dependency jurisdiction was sought, including the likelihood that the mother would protect the child from potential abuse. In the instant case, as in *Ricky T.*, Father's abuse extended to pre-pubescent girls not much older than his son is now, and thus the dependency court reasonably could have found it likely that Father would abuse a pre-pubescent boy. As in both *Ricky T.* and *In re Ana C.*, there is substantial evidence that, in the absence of DCFS and judicial involvement, Mother would permit Father to return to the home and would not limit his access to Jonathan, who is especially vulnerable because of his very young age.

In sum, we reject Father's contention that the lack of evidence that Father has abused his own children in the past forecloses a finding that Jonathan is at substantial risk of sexual abuse. Father's record of egregious and prolonged abuse of four nieces in his home, along with the evidence of Jonathan's vulnerability due to his age and Mother's unwillingness to accept that Father is a sexual predator,

---

[4]   Father contends that *Ricky T.* is inapplicable because there, the abuser had been convicted of sexual abuse and thus the dependency court invoked the presumption under section 355.1, subdivision (d), that a child in the care of a guardian who has been convicted of sexual abuse is at substantial risk of abuse. However, in *Ricky T.*, the appellate court not only held that the presumption of section 355.1, subdivision (d), applied and was unrebutted (*Ricky T., supra,* 214 Cal.App.4th at p. 521), but also held that "[e]ven absent the presumption of section 355.1, subdivision (d), the evidence showed Ricky T. was at risk of harm." (*Id.* at p. 522.) Thus, Father is incorrect that the court's analysis in *Ricky T.* has no bearing here.

suffices to support the finding.  Thus, the dependency court properly asserted jurisdiction over Jonathan, under section 300.

## DISPOSITION

The jurisdictional and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.